**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MAUSUMI SYAMAL, M.D.,

      Plaintiff,

v.                                   Case No.:

RUSH UNIVERSITY
MEDICAL CENTER,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Mausumi Syamal, M.D., ("Syamal" or "Plaintiff"), by and through undersigned counsel, hereby files this Complaint against Defendant, Rush University Medical Center, ("Rush" or "Defendant") and in support thereof states as follows:

## NATURE OF THE CLAIMS

1.     Rush is an academic medical center, hospital and surgical facility that promotes itself as a "leading academic health system" that is "consistently recognized for our outstanding patient care, education, research, and community partnerships." In addition to Rush University Medical Center in Chicago, it operates six (6) other facilities throughout the greater Chicago area. Rush claims to have a strong stance against discrimination in the workplace, stating in its Equal Employment Opportunity Policy, "[f]or more than three decades, our approach to equal opportunity and diversity has not wavered: Equal opportunity and diversity in employment, education and the delivery of health care are essential and must be furthered."

2.     Dr. Syamal is a Board Certified, fellowship-trained Otolaryngologist licensed in the states of Pennsylvania, Michigan and Illinois. Dr. Syamal graduated with Distinction from Duke

University with a Bachelor of Science in Mechanical Engineering and then went on to earn her Master of Science in Engineering at the University of Michigan and worked as a Global Project Engineer for General Motors Corporation prior to earning her medical doctorate from Wayne State University School of Medicine. Dr. Syamal completed her residency in Otolaryngology with Henry Ford Health Systems, followed by a fellowship in voice and airway surgical disorders at the esteemed Cleveland Clinic Foundation, and has been solely assessing surgical laryngeal disorders since 2016. She serves on the editorial board of three (3) major Otolaryngology peer-reviewed journals and is a fellow of the American College of Surgeons, the Triological Society, and the American Laryngological Association (ALA)—the highest honor awarded to laryngologists.

3.      Despite Dr. Syamal's impeccable qualifications, Rush subjected her to a pattern of disparate and discriminatory treatment related to pay, promotion opportunities, terms and conditions of employment, heightened scrutiny, the use of biased survey results in effectuating disciplinary actions, and retaliation stemming from Dr. Syamal's reports of discrimination in the workplace.

4.      This lawsuit arises under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and the Illinois Human Rights Act,775ILCS 5/1-101 for Rush's discrimination against Dr. Syamal on the basis of her gender, race, and national origin, as well as Rush's retaliation against Dr. Syamal for reporting discrimination in the workplace and terminating her employment "without cause," just two (2) months after she filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").

5.      This lawsuit also arises under the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq*. ("EPA"), for Rush's discrimination against Dr. Syamal on the basis of her gender

by paying wages to her at a rate less than the rate at which it pays male employees performing substantially equal work.

## PARTIES

6.      At all relevant times, Plaintiff, Dr. Syamal, was a resident of Chicago, Illinois, and employed by Defendant.

7.      Plaintiff met the definition of an "employee" and/or "covered employee" under all relevant statutes.

8.      Defendant, Rush, is a not-for-profit corporation licensed to do business in the State of Illinois, with its primary place of business located at 1620 W Harrison St., Chicago, IL 60612.

9.      Defendant met the definition of an "employer" or "covered employer" under all applicable statutes.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights pursuant to Title VII and the EPA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

11.      Venue is proper in the Eastern Division of the U.S. District Court for the Northern District of Illinois under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district and because Defendant regularly conducts business within this Judicial District.

## ADMINISTRATIVE PREREQUISITE

12.     Plaintiff timely dual filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights (IDHR") on June 19, 2024.

13.     Plaintiff timely dual filed an amended Charge of Discrimination with the EEOC and the IDHR on September 9, 2024.

14.     On March 31, 2025, the EEOC issued a Notice of Right to Sue, and Plaintiff brings this action within 90 days.

## FACTUAL ALLEGATIONS

15.     Dr. Syamal began her employment with Rush on October 11, 2023, as a Director of Voice, Airway & Swallowing Program – Section Head Laryngology – Assistant Professor working within Rush's Department of Otorhinolaryngology. Her responsibilities included, *inter alia*, coordinating the clinical, education, and research missions of the Laryngology Section. As such, Dr. Syamal was tasked with creating a clinical program that encompasses a full breadth of medical and surgical laryngology, including care of the professional voice, management of benign and malignant laryngeal lesions and vocal cord paralysis, and treatment of swallowing disorders. Additionally, Dr. Syamal was responsible for establishing an Airway Reconstruction Program in collaboration with colleagues in thoracic surgery and interventional pulmonology in the Lung Center and actively creating an education program in laryngology for Rush ENT residents and medical students.

16.     Dr. Syamal was the only senior female surgeon of color in the Department of Otorhinolaryngology.

17.     Dr. Syamal was assigned to perform medical functions for two (2) departments outside of her specific practice area, something not expected or assigned to male surgeons in the Department of Otorhinolaryngology.

18.     Upon information and belief, Dr. Syamal was compensated at a lesser rate than male colleagues performing substantially equal work, including but not limited to Steven Sims, M.D., Bobby Tajudeen, M.D., and Peter Fillip, M.D.

19.     Specifically, Dr. Syamal received roughly $25,000.00 less in annual salary than her male colleagues performing work that required substantially equal skill, effort, and responsibility that was performed under similar working conditions within the same establishment.

20.     Upon information and belief, Dr. Sims was hired into Dr. Syamal's same position and was provided with a contract that paid him a significantly higher salary than Dr. Syamal, even though Dr. Sims does not hold Triological or ALA fellowships.

21.     The pay disparities extended to bonus compensation paid to male physicians. The physicians received a specific dollar amount for meeting and exceeding specific work Relative Value Units ("wRVU's") thresholds for services that required substantially equal skill, effort, and responsibility that were performed under similar working conditions within the same establishment.

22.     Upon information and belief, the wRVU based bonus compensation structure resulted in Dr. Syamal receiving less in annual bonus compensation in addition to the significant base salary disparity than her male colleagues.

23.     Throughout the duration of Dr. Syamal's employment with Rush, she never engaged in any professional malpractice or wrongdoing and provided patients with unparalleled care while steadfastly supporting her fellow medical practitioners and support staff.

24.     In fact, Dr. Syamal's work at Rush resulted in her being awarded the Castle Connolly Chicago Top Doctor designation, which recognizes physicians who demonstrate exceptional expertise, a proven track record of excellence, and the highest standards of patient satisfaction. This designation is based on peer nominations, comprehensive research, and a rigorous evaluation process.

25.     From the outset of Dr. Syamal's employment with Rush, she observed preferential treatment toward male physicians. Despite being promised certain equipment during the hiring process, Dr. Syamal was not provided with the proper stroboscopy equipment necessary for her practice. She repeatedly communicated her need for this equipment, but it was not provided for a period of four (4) months. In stark contrast, a junior male physician within the department received comparable stroboscopy equipment almost immediately upon request.

26.     While Dr. Syamal worked diligently to provide patients with the highest quality care tailored to their individual needs, she was unexpectedly summoned to a meeting on or about April 18, 2024, with Dr. Pete Batra, Chair of the Otolaryngology Department; Alex Moran, Head of Finance; and Elyse Adkins, Interim Nurse Manager.

27.     At that time, Dr. Syamal received vague allegations based on second-hand complaints that were overheard by staff, along with Press-Ganey Care Provider comments for only thirteen (13) of the more than one thousand (1,000) patients she had seen since her hiring.

28.     On or about May 3, 2024, Dr. Syamal sent an email correspondence to Dr. Batra which included literature and peer-reviewed studies related to patient prejudice against female minoritized physicians. Specifically, the Press-Ganey surveys utilized by Rush's Otolaryngology department have been shown to provide biased results on the basis of sex and race.

29.     On or about May 10, 2024, in a meeting with Dr. Batra, Dr. Kerstin Stenson, Head of Mentorship and a physician in the Department, and Ms. Javette Simmons, Human Resources, Dr. Syamal again communicated her specific concerns regarding the policies enacted by Rush leadership and their disparate impact on female physicians of color.

30.     Dr. Batra made the determination to utilize Press-Ganey survey results as a metric in the Otolaryngology department's assessments, despite the fact that other departments within Rush had discontinued use of these surveys due to well-documented concerns about the validity and accuracy of their results.

31.     Specifically, Press-Ganey data is often biased against doctors based on gender, race, and national origin. For example, researchers found "[g]iven that neither race nor specialty influence physician competence, this data suggests that the Press-Ganey survey is a biased measure of physician quality and should not be used to evaluate physician skill or ability."[1]

32.     Perhaps most alarming, is that Press-Ganey systematically scores female physicians less favorably than males, even in gender specific specialties. Press-Ganey patient satisfaction surveys showed female gynecologists "were 18% less likely to receive top patient satisfaction scores compared with men in this multisite, population-based survey study using Press Ganey patient satisfaction surveys."[2]

33.     The bias associated with these results is particularly troubling given that patients treated by female physicians experienced lower mortality and fewer hospital readmissions compared to those treated by male physicians.[3]

---

[1] E.P. DeLoughery, *Physician Race and Specialty Influence Press Ganey Survey Results*, 77 Neth. J. Med. 366 (2019), https://pubmed.ncbi.nlm.nih.gov/31880269/.
[2] L.J. Rogo-Gupta et al., *Women Physicians Receive Lower Press Ganey Patient Satisfaction Scores in a Multicenter Study of Outpatient Gynecology Care*, 229 Am. J. Obstet. Gynecol. 304.e1 (2023), https://doi.org/10.1016/j.ajog.2023.06.023.
[3] Kiyan Heybati et al., *The Association Between Physician Sex and Patient Outcomes: A Systematic Review and Meta-Analysis*, 25 BMC Health Serv. Res. 93 (2025), https://bmchealthservres.biomedcentral.com/articles/10.1186/s12913-025-12247-1.

34.     Rush took no remedial measures in response to Dr. Syamal's reports of the Otolaryngology department's utilization of Press-Ganey survey results and the disparate impact it had on female physicians of color.

35.     Instead, Dr. Batra and Mr. Moran retaliated against Dr. Syamal by instructing members of the Laryngology team to bypass the Department's standard patient complaint handling protocol and instead escalate any complaints concerning Dr. Syamal directly to leadership.

36.     At the time of the alleged negative survey results and/or patient complaints, Rush's Practice Manager for the Department of Otolaryngology, Adrienne Upchurch, was responsible for investigating complaints from patients.

37.     Ms. Upchurch investigated negative survey results and/or patient complaints against Dr. Syamal, which involved interviews with the patients who effectuated the complaints and found no wrongdoing on behalf of Dr. Syamal. In at least one (1) instance, the patient retracted their complaint and apologized for their conduct.

38.     The results of Ms. Upchurch's investigation were provided directly to her superiors, which included Dr. Batra.

39.     Nonetheless, on or about May 23, 2024, Rush imposed a Focused Professional Practice Evaluation Plan ("FPPE") on Dr. Syamal, citing an alleged violation of Rush's "Prohibition on Disruptive Conduct" as set forth in its Code of Conduct—despite the fact that internal investigation results revealed no misconduct.

40.     The FPPE imposed punitive and stigmatizing measures, including a minimum of six (6) psychiatric evaluation sessions typically reserved for staff with substance abuse issues, and a three (3) month monitoring process. The FPPE further stated that "[t]wo or more patient complaints and/or substantiated violations of the Rush University Medical Staff Code of Conduct,

the Prohibition on Disruptive Conduct HR-E 01.50, or the Department of Otorhinolaryngology – Head and Neck Surgery Code of Conduct would be considered a failure to successfully complete this FPPE."

41.     The FPPE lacked any meaningful specificity and was devoid of any documentation to corroborate the allegations.

42.     In an effort to understand the nature of the alleged complaints and correct any purported deficiencies, Dr. Syamal diligently requested the documentation relied upon in crafting the FPPE. Dr. Batra refused to provide the requested documents, citing the "confidential nature of the complaints."

43.     After repeated follow-up requests, Dr. Syamal, through retained legal counsel, was eventually provided with heavily redacted copies of the "complaints" that formed the basis of the FPPE.

44.     The so-called "complaints" referenced by Rush consisted of four (4) communications that were not independently submitted, but rather were directly solicited by Dr. Batra from a small group of his personal allies, including Elyse Adkins, Michael Eggerstedt, Peter Papagiannopoulos, and Elias Michaelides.

45.     Upon information and belief, Rush engaged in a retaliatory campaign to discredit Dr. Syamal and justify her removal by soliciting purported complaints from individuals who lacked any surgical or clinical firsthand experience with her. These individuals had not directly observed or worked with Dr. Syamal in a professional medical capacity. The resulting peer reviews, procured from a narrowly selected and non-representative group, constituted a sham process orchestrated to create a pretextual justification for Dr. Syamal's termination.

46.     In furtherance of this retaliatory effort, Rush selectively compiled documentation intended to portray Dr. Syamal in a negative light, while omitting substantial and material positive feedback that she received during her tenure.

47.     Among the omitted documentation was a written report prepared by Dr. Jay Behel, a psychologist who observed Dr. Syamal's clinic at the request of Dr. Batra. Dr. Behel wrote: "I really enjoyed spending time in your clinic. Your work and workflow are really challenging, but you do a good job of setting an upbeat tone with your team and patients. I certainly do not have a magic bullet for making patients enthusiastic about being scoped or needing to consider surgery."

48.     Rush also excluded from its records written correspondence from two (2) Trustees of the institution who provided favorable feedback regarding their direct experiences with Dr. Syamal, numerous positive patient reviews, and formal commendations from Rush's Chief Medical Officer, as well as members of the Laryngology team. The exclusion of this documentation further demonstrates the retaliatory and pretextual nature of the actions taken against Dr. Syamal.

49.     On June 19, 2024, due to the ongoing discriminatory and retaliatory treatment Dr. Syamal was facing, which Rush failed to address, Dr. Syamal dual filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") citing violations of Title VII of the Civil Rights Act of 1964 and the state equivalents per the Illinois Human Rights Act.

50.     In addition to filing her Charge of Discrimination, Dr. Syamal also opposed the discriminatory and retaliatory treatment by submitting internal complaints to Rush's Office of Institutional Equity ("OIE") and to her direct superiors.

51.     As part of her internal filings, Dr. Syamal reported several instances in which female employees within the Department of Otolaryngology were targeted by Dr. Batra and subjected to retaliation after reporting a discriminatory work environment, including discriminatory departmental policies and pay disparities affecting female physicians.

52.     Shortly thereafter, Dr. Syamal was informed by Dr. Batra that her wRVU (work relative value unit) target would be increased by an unprecedented percentage—despite the fact that she was only in her ninth (9th) month of employment with the organization. The newly implemented wRVU target deviated materially from the original terms agreed upon between Dr. Syamal and Rush at the time of her recruitment.

53.     Rush took no remedial measures to address Dr. Syamal's reports of discrimination and declined to speak with multiple witnesses who possessed firsthand knowledge of Dr. Batra's discriminatory conduct toward female employees, including sexist remarks and discriminatory hiring and pay practices.

54.     After becoming aware of Dr. Syamal's dual-filed EEOC and IDHR Charges of Discrimination on or before July 8, 2024, Dr. Batra engaged in additional retaliatory conduct by weaponizing newly implemented departmental policies in a targeted manner against Dr. Syamal, causing unnecessary administrative burdens that adversely affected patient care.

55.     As a result, on or about July 29, 2024, Dr. Syamal formally documented and reported this retaliatory conduct to Catherine C. Howlett, J.D., Senior Investigative Counsel and Deputy Title IX Coordinator for Rush Legal.

56.     On or about August 21, 2024, Ms. Howlett notified Dr. Syamal that the investigation would be closed, despite Rush's failure to speak with several individuals Dr. Syamal

had provided as witnesses, including Krupa Patel, M.D., the only other female surgeon of color within the department.

57.     On or about August 22, 2024, Dr. Syamal received a letter dated August 21, 2024, informing her that the FPPE process had been closed, having been successfully completed. Rush acknowledged that Dr. Syamal had fulfilled the FPPE's punitive requirements and had no further violations under the evaluation's terms.

58.     Throughout the duration of the FPPE process, Dr. Syamal was not notified of any additional performance issues or disciplinary matters that would reasonably support an adverse employment action.

59.     Nevertheless, almost immediately after receiving confirmation that the FPPE had been successfully closed, Dr. Syamal was directed to attend a video conference meeting with Dr. Batra, Dr. Peter Revenaugh, Dr. Kerstin Stenson, and representatives from Human Resources.

60.     At that meeting, Dr. Syamal was informed that although the FPPE process had been completed, Rush elected to terminate her employment **without cause**, effective September 1, 2024.

61.     Dr. Syamal was informed that there were issues regarding her "fit" within the department and "concerns about [her] behavior." However, she was never provided with any specific examples of alleged misconduct or behavior to support these vague assertions. Nor was she given an opportunity to address or correct any purported deficiencies through the institution's progressive discipline policies.

62.     As the termination was categorized as "without cause," Rush was contractually obligated to provide Dr. Syamal with ninety (90) days of severance pay.

63.     Meanwhile, similarly situated male physicians at Rush who were reported for far more serious conduct—including documented patient safety violations, fraudulent billing

practices, discriminatory conduct, and acts of sexual harassment—remained employed and were not subjected to comparable scrutiny or discipline.

64.     Rush's decision to terminate Dr. Syamal was motivated by retaliatory animus and was taken in response to her efforts to oppose discriminatory treatment, unequal pay, and other violations of her civil rights.

65.     As a direct and proximate result of her opposition to unlawful employment practices and her protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq*. ("EPA"), and the Illinois Human Rights Act ("IHRA"), Rush retaliated against Dr. Syamal by terminating her employment.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.
### (Sex Discrimination)

66.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

67.     Defendant's conduct, as alleged herein, violated Title VII, which prohibits discrimination on the basis of gender/sex.

68.     Defendant discriminated against Plaintiff on the basis of her sex, female, in violation of § 2000e-2.

69.     Similarly-situated male employees of Defendant did not receive the same treatment as Plaintiff.

70.     Defendant created a hostile working environment for Plaintiff due to Plaintiff's sex.

71.     Defendant's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff's federally protected rights.

72.     As a direct result of Defendant's discriminatory actions, Plaintiff suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the termination;

(ii)    front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

## COUNT II
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.
(Race/Color)**

73.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

74.     Defendant's conduct, as alleged herein, violated Title VII, which prohibits discrimination on the basis of race and color.

75.     Plaintiff is brown/Asian and a member of a protected class.

76.     Defendant terminated Plaintiff's employment on the basis of her race and/or color in violation of § 2000e-2.

77.     Similarly situated employees not of brown/Asian race or color did not receive the same treatment as Plaintiff.

78.     Defendant's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff's federally protected rights.

79.     As a direct result of Defendant's discriminatory actions, Plaintiff has suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the termination;

(ii)    front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

## COUNT III
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.**
**(National Origin)**

80.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

81.     Defendant's conduct, as alleged herein, violated Title VII, which prohibits discrimination on the basis of national origin.

82.     Defendant discriminated against Plaintiff on the basis of her national origin, Indian, in violation of § 2000e-2.

83.     Similarly-situated employees not of Indian origin did not receive the same treatment as Plaintiff.

84. Defendant created a hostile working environment for Plaintiff due to her national origin, Indian.

85. Defendant's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff's federally protected rights.

86. As a direct result of Defendant's discriminatory actions, Plaintiff suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i) all back pay lost as a result of the termination;

(ii) front pay;

(iii) compensatory damages;

(iv) punitive damages;

(v) her attorneys' fees and costs; and

(vi) such other and further relief as this Court deems just and proper under the circumstances.

## COUNT IV
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Retaliation)

87. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

88. Defendant's conduct, as alleged herein, violated Title VII, which prohibits retaliation on the basis of sex, race, color, and national origin.

89.     Defendant retaliated against Plaintiff for exercising her rights under Title VII by terminating her employment because Plaintiff reported instances of discriminatory treatment in the workplace and filed a Charge of Discrimination with the EEOC.

90.     Defendant's unlawful retaliation was intentional and done with malice and reckless indifference to Plaintiff's federally protected rights.

91.     As a direct result of Defendant's retaliatory actions, Plaintiff suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

  (i)     all back pay lost as a result of the termination;

  (ii)    front pay;

  (iii)   compensatory damages;

  (iv)    punitive damages;

  (v)     her attorneys' fees and costs; and

  (vi)    such other and further relief as this Court deems just and proper under the circumstances.

## COUNT V
### Violation of The Illinois Human Rights Act
### (Discrimination)

92.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

93.     Defendant's conduct, as alleged herein, violated the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, which prohibits discrimination on the basis of sex, race, national origin, and color.

94.     Defendant terminated Plaintiff's employment based on her protected status under the IHRA.

95.     Defendant's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff's rights protected by the State of Illinois.

96.     As a direct result of Defendant's discriminatory actions, Plaintiff suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the termination;

(ii)    front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

## <u>COUNT VI</u>
### Retaliation in Violation of the Illinois Human Rights Act

97.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

98.     Defendant's conduct, as alleged herein, violated the Illinois Human Rights Act, 775 ILCS 5/6-101, which prohibits retaliation.

99.     Defendant retaliated against Plaintiff for exercising her rights under the IHRA by terminating her employment because Plaintiff reported instances of discriminatory treatment in the workplace and filed a Charge of Discrimination with the Illinois Department of Human Rights.

100.     Defendant's unlawful retaliation was intentional and done with malice and reckless indifference to Plaintiff's rights protected by the State of Illinois.

101.     As a direct result of Defendant's retaliatory actions, Plaintiff suffered damages including lost wages, non-monetary damages and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the termination;

(ii)     front pay;

(iii)     compensatory damages;

(iv)     punitive damages;

(v)     her attorneys' fees and costs; and

(vi)     such other and further relief as this Court deems just and proper under the circumstances.

## COUNT VII
### Violation of the Equal Pay Act of 1963

102.     Plaintiff incorporates paragraphs 1 through 65 as though fully stated here.

103.     At all times material to this Complaint, Rush was an employer within the meaning of the EPA, Title 29 U.S.C. § 203(d).

104.     Rush violated the EPA, Title 29 U.S.C. § 206(d), by paying Plaintiff less than male employees  performing substantially equal work.

105.     Male employees at Defendant who had the same skill, effort and responsibility

needed to perform the work as Plaintiff, performed under similar working conditions, were paid more than Plaintiff in violation of the EPA, Title 29 U.S.C. § 206(d).

106.    Defendant's violations of the EPA caused Plaintiff significant monetary harm.

107.    Defendant's violations of the EPA were willful.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)    all back pay lost as a result of the failure to pay equal wages;

(ii)   liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages;

(iii)  her attorneys' fees and costs; and

(iv)   such other and further relief as this Court deems just and proper under the circumstances.

## <u>COUNT VIII</u>
### Retaliation in Violation of the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3)

108.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 65 as though fully set forth herein.

109.    The Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3), prohibits employers from discharging or in any other manner discriminating against any employee because that employee has opposed any act or practice made unlawful by the Equal Pay Act, or because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the Act.

110.    Plaintiff engaged in protected activity under the EPA when she raised concerns and/or complaints about female physicians being paid less than similarly situated male employees for performing substantially equal work.

111.    Defendant was aware of Plaintiff's complaints regarding unequal pay.

112.    Shortly after Plaintiff's complaints, Defendant took adverse action against her, including but not limited to increased scrutiny, the imposition of punitive measures, and ultimately the termination of her employment.

113.    Defendant's retaliatory actions were motivated by Plaintiff's protected activity under the Equal Pay Act.

114.    Defendant's retaliation was willful and undertaken with malice and/or reckless disregard for Plaintiff's rights under federal law.

115.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, benefits, emotional distress, reputational harm, and attorney's fees.

WHEREFORE, Plaintiff, Mausumi Syamal, M.D., respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)  all wages, benefits, and other compensation lost as a result of the unlawful retaliation in violation of the Equal Pay Act;

(ii)  liquidated damages in an amount equal to the wages, benefits, and compensation lost as a result of the retaliation, pursuant to 29 U.S.C. § 216(b);

(iii)  attorneys' fees and costs incurred in bringing this action, as provided by 29 U.S.C. § 216(b); and

(iv)  such other and further relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  May 9, 2025                                   Respectfully Submitted,

/s/ Kimberly De Arcangelis
Kimberly De Arcangelis, Esq.
Florida Bar No.: 0025871
(*Admitted to General and*
*Trial Bar of this Court*)
MORGAN & MORGAN, P.A.
20 N. Orange Ave., 15th Floor
Orlando, FL 32801
Telephone: (407) 420-1414
Facsimile: (407) 245-3383
Email: kimd@forthepeople.com

*Counsel for Plaintiffs*